## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EMPIRE HEALTH FOUNDATION, *et al.*,

Plaintiffs,

v.

SYLVIA M. BURWELL, in her capacity as Secretary of Health and Human Services,

Defendant.

Civil Action No. 15-2251 (JEB)

## MEMORANDUM OPINION

Are we there?  Is Godot coming?   Is this agency decision final?  Needing to ask typically signals the answer: Not yet.  This case involves Medicare reimbursements for hospital services provided over ten years ago.  In that decade, Plaintiffs Empire Health Foundation and hospitals it owns have sought reimbursement through successive stages of Medicare's administrative-review process.  Just when they thought that the process was culminating,  the Provider Reimbursement Review Board then reviewing their claim remanded it, directing them to start over.  Empire Health had enough and sued to challenge that remand order.

Defendant Sylvia Burwell, the Secretary of Health and Human Services, now moves to dismiss the Complaint for want of subject-matter jurisdiction.  She argues that it is not yet time to hear this case, as the remand does not constitute a final agency decision for the Court to review.  Because the Court agrees, it will grant the Motion and let the administrative gears keep grinding.

## I.     Background

Plaintiff Empire Health is a charitable organization based in Spokane, Washington, which owns Valley Hospital and Deaconess Medical Center (also Plaintiffs here).  See Second Am. Compl. (SAC), ¶ 5.  Some time ago, those hospitals provided services and are now in the midst of a process to obtain Medicare reimbursement.  (For ease of reference, the Court will refer to all Plaintiffs collectively as "Empire Health.")  Before exploring Plaintiffs' quest, the Court will lay out how Medicare reimbursement works generally.

### A.  Medicare Reimbursement Process

Title XVIII of the Social Security Act, commonly known as the Medicare Act, establishes the federal Medicare program.  See 42 U.S.C. § 1395 *et seq*.  Medicare funds medical care for elderly or disabled persons by reimbursing hospitals and other entities for services that they provide those patients.  See Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 2 (D.C. Cir. 2011).  The Center for Medicare and Medicaid Services (CMS), a component of the Department of Health and Human Services, administers the reimbursement process.  See Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006).

Reimbursement, apparently, is far from swift.  At the start of the Medicare process, CMS enlists private companies – known as "fiscal intermediaries" – to tabulate who is owed what.  To that end, at year's close, providers participating in Medicare submit cost reports to their fiscal intermediaries.  See Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 822 (2013); see also 42 C.F.R. §§ 413.20, 413.24.  These intermediaries then audit each cost report and inform the provider of the total amount of Medicare reimbursement to which it is entitled, in a document known as a Notice of Program Reimbursement (NPR).  See Emanuel Med. Ctr., Inc. v. Sebelius, 37 F. Supp. 3d 348, 350 (D.D.C. 2014) (citing 42 C.F.R. § 405.1803).

A hospital or other provider believing that it is not being reimbursed its fair share in the NPR may bring a challenge with the Provider Reimbursement Review Board (PRRB) and, if still unsatisfied, obtain further review by the Secretary (which occurs at her discretion). See 42 U.S.C. § 1395oo(a), (f). "The Board can affirm, modify, or reverse the fiscal intermediary's award; the Secretary in turn may affirm, modify, or reverse the PRRB's decision." Emanuel, 37 F. Supp. 3d at 350 (citing 42 U.S.C. § 1395oo(d)-(f)). If, at the end of these appeals, the provider still feels shortchanged, it has "the right to obtain judicial review of any final decision." 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1877.

B. Medicare Reimbursement Amount

Beyond this intricate procedural setup, brewing the actual reimbursement amount itself requires a master class in molecular gastronomy. Although this Opinion will provide only an overview of how the NPR is concocted, past Opinions of this Court detail the reimbursement recipe. E.g., Cooper Hosp./Univ. Med. Ctr. v. Burwell, No. 14-1991, 2016 WL 1436646, at *2-3 (D.D.C. Apr. 11, 2016).

To begin, even though Medicare purportedly reimburses hospitals for providing services, the actual reimbursement sum is roughly pegged to the number of patients discharged. See 42 U.S.C. § 1395ww(d). Certain adjustments are then tossed into the cauldron. One such adjustment is a bump-up for hospitals that "serve[] a significantly disproportionate number of low-income patients" – the so-called "disproportionate share hospital" or "DSH" adjustment. See 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

This DSH adjustment relies on another formula, which churns out a percentage representing the number of low-income patients that the hospital serves. See id. § 1395ww(d)(5)(F); see also Allina Health Servs. v. Sebelius, 746 F.3d 1102, 1105 (D.C. Cir.

2014).  One ingredient in this percentage is a fraction that takes into consideration the number of hospital-inpatient days spent by patients who were covered by Medicare and received Supplemental Security Income.  <u>See</u> 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I).  CMS determines this Medicare-SSI fraction by matching Medicare-patient billing records with individual SSI records maintained by the Social Security Administration; the Agency then provides that fraction to the fiscal intermediary calculating the DSH adjustment and reimbursement entitlement.  <u>See</u> 75 Fed Reg. 50,276 (Aug. 16, 2010).

   C.  <u>CMS Ruling 1498-R</u>

So what could possibly go wrong?  A few years back, this convoluted scheme came under attack, resulting in a decision by a fellow judge in this district that required HHS to tweak its Medicare-SSI fraction.  <u>See</u> <u>Baystate Med. Ctr. v. Leavitt</u>, 587 F. Supp. 2d 37 (D.D.C. 2008), <u>as amended</u>, 587 F. Supp. 2d 44 (D.D.C. 2008).  In response, in 2010, CMS published a ruling that attempted to fix some of the issues raised, by making three alterations to how the fraction was calculated.  <u>See</u> CMS Ruling 1498-R, 2010 WL 3492477 (Apr. 28, 2010).  That Ruling in part rejiggered the process for matching Medicare and SSI records.  <u>See</u> <u>id.</u> at *2.

Central for our purposes, CMS Ruling 1498-R also provided that any pending reimbursement appeals related to the data-matching issue would automatically be sent back to the fiscal intermediaries for recalculation.  Specifically, the Ruling stated that the PRRB "lack[s] jurisdiction over each properly pending claim on the SSI fraction data matching process issue." <u>Id.</u> at *3.  Only after further number-crunching by the fiscal intermediary would the revised NPR be "subject to administrative and judicial review in accordance with the applicable jurisdictional and procedural requirements of section 1878 of the Act, the Medicare regulations, and other agency rules and guidelines."  <u>Id.</u> at *14.

4

D.  Empire Health's Reimbursement Challenges

This brings the Court to the present case.  In 2009, Empire Health lodged a challenge with the PRRB to its fiscal intermediary's reimbursement sum for several fiscal years beginning in 2005.  See ECF No. 21, Exh. 2 (PRRB Remand Order).  Because Empire Health objected to, *inter alia*, the Medicare-SSI data-matching process that was used, in October 2015 the PRRB remanded the dispute to the fiscal intermediary for recalculation pursuant to CMS Ruling 1498-R.  See id. at 2 ("[T]he Ruling requires that Board remand each qualifying appeal of this issue to the appropriate Medicare contractor to recalculate each provider's DSH payment.").

Displeased with this instruction to start over again, Plaintiffs sent a letter to the PRRB informing it that the Medicare-SSI-fraction challenge "WAS NOT our only claim – nor was it our primary claim."  ECF No. 21, Exh. 3 (Nov. 4, 2015, Letter to PRRB).  Empire Health, in effect, objected to the Board's remanding its whole reimbursement appeal when only part of that appeal fell within the ambit of CMS Ruling 1498-R.

Before the PRRB could respond, Plaintiffs in December 2015 filed this suit to challenge issues relating to reimbursement.  See ECF No. 1 (Complaint), 8 (First Amended Complaint).   In February 2016, the PRRB denied Empire Health's request to undo the remand.  See ECF No. 21, Exh. 4 (Feb. 29, 2016, Letter from PRRB).  Following Defendant's first motion to dismiss for lack of subject-matter jurisdiction, Plaintiffs again narrowed their Complaint so that it sought judicial review only of the remand order.  Specifically, Empire Health now brings five counts: three challenging CMS Ruling 1498-R's legality (Counts I through III) and two attacking the enforcement of the Ruling as arbitrary and capricious (Counts IV and V).  See SAC, ¶¶ 3, 42-70.

With this most recent Complaint in hand, the Secretary has again moved to dismiss for lack of subject-matter jurisdiction.   That Motion is now ripe.

## II.      Legal Standard

When a defendant brings a Rule 12(b)(1) motion to dismiss, the plaintiff must demonstrate that the Court indeed has subject-matter jurisdiction to hear its claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion [also] imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  In policing its jurisdictional borders, the Court must scrutinize the complaint, treating its factual allegations as true and granting the plaintiff the benefit of all reasonable inferences that can be derived from the alleged facts.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The Court need not rely "on the complaint standing alone," however, but may also look to undisputed facts in the record or resolve disputed ones.  See Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

## III.     Analysis

Jurisdiction, in this case, depends on whether there has been a final agency decision to review.  More specifically, does the remand order constitute such a final decision?  In non-Medicare contexts, courts often label this requirement as one of finality – "whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193 (1985).  A related issue concerns exhaustion – whether the complainant has availed itself of the "administrative and judicial procedures [to] seek review of an adverse decision and

obtain a remedy if the decision is found to be unlawful or otherwise inappropriate." Id.; see

Darby v. Cisneros, 509 U.S. 137, 144 (1993) (explaining doctrines are "conceptually distinct").

Compared to these long-extant, judicially crafted doctrines, the Medicare Act is

"significantly different" in that it provides as a jurisdictional prerequisite its own statutory set of

finality and exhaustion requirements. Weinberger v. Salfi, 422 U.S. 749, 766 (1975).

Specifically, the Act incorporates a judicial-review provision from the Social Security Act:

> The findings and decision of the [Secretary] after a hearing shall be
> binding upon all individuals who were parties to such hearing. No
> findings of fact or decision of the [Secretary] shall be reviewed by
> any person, tribunal, or governmental agency except as herein
> provided. No action against the United States, the [Secretary], or
> any officer or employee thereof shall be brought under section 1331
> or 1346 of Title 28 to recover on any claim arising under this
> subchapter.

42 U.S.C. § 405(h); see id. § 1395ii (incorporating § 405(h)).

Let's unpack this block quote. The "first two sentences" – regarding the effect and

review of administrative actions – "assure that administrative exhaustion will be required."

Salfi, 422 U.S. at 757. In particular, by precluding review "except as herein provided," they

"prevent review of [Medicare] decisions . . . save as provided in the Act." Id. The Act, in turn,

elucidates what level of administrative review must be achieved before providers seek judicial

review: Before coming to federal court, providers must have their administrative appeals reach

either the PRRB or the Secretary (if she conducts a review). See 42 U.S.C. § 1395oo(f)(1).

Courts have interpreted the third sentence to "preclude[] resort to federal-question

jurisdiction" not only of Medicare-based causes of action but of "any claim arising under" the

Act – e.g., constitutional challenges – unless the entire underlying Medicare action has made its

way through the administrative-review system first. Salfi, 422 U.S. at 760-62. This "'claim

arising under' language quite broadly . . . include[s] any claims in which 'both the standing and

the substantive basis for the presentation' of the claims is the [Medicare] Act." Heckler v.
Ringer, 466 U.S. 602, 615 (1984).  This "broad test" captures even constitutional claims brought
in the administrative proceedings, see Salfi, 422 U.S. at 762, or challenges to the administrative
procedures themselves.  See Ringer, 466 U.S. at 616-17; see also Shalala v. Ill. Council on Long
Term Care, Inc., 529 U.S. 1, 7 (2000) (involving constitutional, statutory, and procedural
objections).

     Understood as a whole, the judicial-review provisions "demand[] the 'channeling' of
virtually all legal attacks through the agency." Ill. Council, 529 U.S. at 13.  In other words, they
require "all claims of errors related to the administrative proceedings" to be brought in federal
court only "at the conclusion of that process." Jordan Hosp. v. Leavitt, 571 F. Supp. 2d 108, 117
(D.D.C. 2008).  In this way, the Medicare Act's requirements prevent "premature interference
with agency processes, so that the agency may function efficiently and so that it may have an
opportunity to correct its own errors, to afford the parties and the courts the benefit of its
experience and expertise, and to compile a record which is adequate for judicial review." Salfi,
422 U.S. at 765.  "As so interpreted, the bar of § 405(h) reaches beyond ordinary administrative
law principles [such as] 'exhaustion of administrative remedies.'" Ill. Council, 529 U.S. at 12
(quoting Salfi, 422 U.S. at 757); see Tataranowicz v. Sullivan, 959 F.2d 268, 275 (D.C. Cir.
1992).

     With these broad principles in mind, the conclusion that Empire Health's Medicare
process has not yet terminated seems inescapable – that is, the reimbursement amount is not yet
set in stone nor has the action even made its way back to the PRRB. See 42 U.S.C.
§ 1395oo(f)(1).  The initial intermediary is instead now taking "an opportunity to correct its own
errors" pursuant to CMS Ruling 1498-R's recalculation command. Salfi, 422 U.S. at 765.  After

that recalculation is complete, any resultant NPR would then be subject to further administrative review. See CMS Ruling 1498-R at *14. And if during this process something goes awry, in a subsequent civil action "all claims of error" – whether constitutional, statutory, or administrative – could still be brought. Jordan Hosp., 571 F. Supp. 2d at 117; see Ill. Council, 529 U.S. at 23 (holding district courts have "adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide"). In addressing an attempt to obtain judicial review of a remand order in accordance with this Ruling, another district judge has thus cursorily found that "this Court does not have jurisdiction." Emanuel, 37 F. Supp. 3d at 355.

Plaintiffs nonetheless identify three tracks that could lead to subject-matter jurisdiction in this case. They contend alternatively that: (1) a PRRB dismissal for lack of Board jurisdiction is a final agency decision, (2) they fall under a narrow exception that applies if administrative or judicial review has been precluded, and (3) the even narrower "Leedom jurisdiction" exception applies. The Court examines each in turn.

A. Finality of PRRB Dismissal

Empire Health first stresses that, because the PRRB remand order was a jurisdictional dismissal, it constitutes a final agency decision. See SAC, ¶ 3; Opp. at 24-30. The reason Plaintiffs wish to characterize it thus is that the relevant regulations treat these two actions differently. Jurisdictional dismissals are sufficiently final for judicial review. See 42 C.F.R. §§ 405.1840(c)(2), 405.1875(a)(2)(ii), 405.1877(c)(3); see also Athens Cmty. Hosp. v. Schweiker, 686 F.2d 989, 994 (D.C. Cir. 1982). Standing in contrast, a remand order "is not subject to immediate judicial review." 42 C.F.R. § 405.1877(c)(3); see Opp. at 25 ("Board remand orders are not subject to immediate judicial review.").

So into which category does the PRRB's decision here fall?  Unfortunately, CMS Ruling 1498-R, which underpins that decision, implies it could be either.  Some of the Ruling's language contains a jurisdictional reference: it provides that the PRRB "lack[s] jurisdiction over each properly pending claim on the SSI fraction data matching process issue" and that "CMS' action eliminates any actual case or controversy regarding the hospital's previously calculated [Mediare-SSI] fraction and DSH payment adjustment and thereby renders moot each properly pending [data-matching] claim."  CMS Ruling 1498-R at *3, 17.  Other parts of the Ruling, conversely, specify that the PRRB is not <u>dismissing</u> but rather is "<u>remanding</u> each claim that qualifies for relief" to the fiscal intermediary.  <u>Id.</u> at *8 (emphasis added).

CMS Ruling 1498-R is thus no doubt confusing *vis-à-vis* judicial review.  In a different case, the PRRB has even thrown up its hands in perplexity, lamenting that a certain "regulation and the Ruling . . . pose an irreconcilable conflict, the resolution of which is outside the Board's authority to resolve."  <u>Sw. Consulting  v. Blue Cross Blue Shield Ass'n</u>, PRRB No. 2010-D36 (ECF No. 22, Exh. 3) at 12.  Empire Health insists, however, that orders pursuant to this Janus-faced Ruling <u>must</u> be read as dismissals for lack of PRRB jurisdiction.

While such a position is understandable, the Court believes it is ultimately mistaken.  References to "jurisdiction" are unfortunately often thrown around in a hapless manner.  <u>See</u> <u>Margoles v. Johns</u>, 483 F.2d 1212, 1220 (D.C. Cir. 1973) ("The law regarding jurisdiction matters is confusing enough; it needs less legal fictions, not more."); <u>see also</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 90 (1998) ("'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings.'") (quoting <u>United States v. Vanness</u>, 85 F.3d 661, 663 n.2 (D.C. Cir. 1996)).  The relevant question is whether the oblique reference to "jurisdiction" in CMS Ruling 1498-R is intentional or simply the result of sloppy drafting.

Luckily, the relevant regulations specifically lay out what "jurisdiction" generally means in the PRRB context. The Board has "jurisdiction" whenever there is a final fiscal-intermediary determination, a certain amount-in-controversy is met, and the provider appeals in a set timeframe. See 42 C.F.R. §§ 405.1835(a), 405.1840(b); see also id. § 405.1837(a) (providing additional requirements for group appeals). These requirements reflect traditional "threshold ingredient[s]" of jurisdiction – for providers, basic foot-in-the-door prerequisites. Reed Elsevier, Inc. v. Muchnick, 559 U.S. 154, 162 (2010) (quoting Arbaugh v. Y & H Corp., 546 U.S. 500, 514-15 (2006)) (discussing amount-in-controversy as jurisdictional). By putting up these rudimentary jurisdictional fences, the regulations prescribe the PRRB's "adjudicatory authority." Kontrick v. Ryan, 540 U.S. 443, 455 (2004).

Nothing in CMS Ruling 1498-R, however, addresses these sorts of bare-bones prerequisites traditionally attached to PRRB jurisdiction. See, e.g., 42 C.F.R. §§ 405.1835(a), 405.1840(b). Nor does it impinge on the PRRB's authority to hear DSH-adjustment appeals. Instead, under the Ruling, the Board does have authority: It has authority to find that certain appeals relate to the data-matching process and to take action by sending those cases back to fiscal intermediaries for recalculation. In any post-remand appeal, moreover, the Board retains authority to hear those same reimbursement appeals. See CMS Ruling 1498-R at *14 (providing that "revised NPR will be subject to administrative and judicial review in accordance with the applicable jurisdictional and procedural requirements"). Far from being jurisdictional by peremptorily removing certain cases from the PRRB's purview entirely, the Ruling is more similar to a "claim-processing rule" that seeks to maximize administrative economy: The Board quickly identifies a certain subset of cases, it remands them to the fiscal intermediary, the intermediary then reworks its numbers, and the Board finally conducts its review on a corrected

NPR. Reed Elsevier, 559 U.S. at 161. As these steps demonstrate, CMS Ruling 1498-R functionally requires a simple remand.

Although federal-court analogs are rare, a somewhat similar one comes by way of the numerous remands that came on the heels of United States v. Booker, 543 U.S. 220 (2005), which rendered the Sentencing Guidelines advisory rather than mandatory. Following Booker, courts of appeal routinely issued "limited remand[s]" so that district courts could reassess the proper sentence under newly applicable sentencing law. See United States v. Coles, 403 F.3d 764, 770 (D.C. Cir. 2005). Courts were clear, however, that this procedure did not affect appellate jurisdiction – and, indeed, in some cases, those courts "retain[ed] jurisdiction throughout the limited remand." Id. The PRRB's remand pursuant to the CMS Ruling, by also requiring that lower-tier decisionmakers address recent legal changes first, are akin to this sort of routine non-jurisdictional remand found in federal courts.

Once one examines how CMS Ruling 1498-R's actually works, its superficially conflicting terminology dissipates – the Ruling explicitly asks for remands, and those remands in fact occur. Such a mere remand order, however, is not fit for judicial review. See 42 C.F.R. § 405.1877(c)(3).

B. Exception for Preclusion of Judicial Review

The second possible route to federal jurisdiction is via a doctrine known as the "Michigan Academy exception." See Council for Urological Interests v. Sebelius, 668 F.3d 704, 707 (D.C. Cir. 2011). Neither side offers particular help here: Plaintiffs never explicitly mention this doctrine by name, and Defendant frequently overlooks the most relevant sections of the cases that would counter Plaintiffs' position. See Opp. at 9-24; SAC, ¶ 60.

In any event, this exception proceeds from the "strong presumption that Congress intends judicial review of administrative action." Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 670 (1986).  In Michigan Academy, the Supreme Court addressed a challenge to Medicare Part B at a time when the Medicare Act provided no administrative- or judicial-review mechanism for challenges to that Part.  That case held that, despite § 405(h)'s usual bar of judicial review absent administrative exhaustion, such review was nonetheless available because no administrative scheme was in place.  See id. at 678-81; see also Action Alliance of Senior Citizens v. Leavitt, 483 F.3d 852, 860 (D.C. Cir. 2007) (where no judicial-review mechanism was set up for certain Part D claims).

The Supreme Court subsequently expounded on the Michigan Academy exception in Illinois Council, concluding that the exception would apply to "a particular category of cases" where applicable statutes and regulations would not lead to a channeling of claims through the administrative process, but would instead lead to no review at all.  See 529 U.S. at 17; Council for Urological Interests, 668 F.3d at 708 (applying exception to both "administrative and judicial review" deficiencies).  That is, the Michigan Academy exception covers situations where "what appears to be simply a channeling requirement" in fact turns into a "complete preclusion of judicial review."  Ill. Council. 529 U.S. at 22-23; see Am. Chiropractic Ass'n, Inc. v. Leavitt, 431 F.3d 812, 816 (D.C. Cir. 2005).  The exception, conversely, does not apply where administrative-processing rules merely require "postponement," "inconvenience," or "cost" to the service provider before judicial review is obtained.  Ill. Council, 529 U.S. at 22.

Although one might initially think that the exception set up by this duo of Midwestern cases is quite narrow and definite in scope, it turns out that the Medicare Act's complex judicial-review topography is punctured by sinkholes.  See, e.g., Mich. Acad., 476 U.S. 667; Council for

Urological Interests, 668 F.3d 704; Action Alliance, 483 F.3d at 860. To address a panoply of recurrent judicial-review glitches, what once might have seemed like a bright-line rule has now disintegrated into a standard that permits jurisdiction "when roadblocks practically cut off any avenue to federal court." Am. Chiropractic, 431 F.3d at 816 (emphasis added); cf. Ill. Council, 529 U.S. at 22 (declining to decide whether there was "practical equivalent of a total denial of judicial review") (quoting McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 497 (1991)). So, for instance, the roadblock was not so significant in a suit by an association of chiropractors where some chiropractors (though not others) had an available administrative-review process that could lead to a judicially reviewable final agency decision; on the other hand, an association could immediately bring a federal suit where a practical roadblock existed insofar as none of its members had an available process but instead had to rely on a third party to present its challenges. Compare Am. Chiropractic, 431 F.3d at 817, with Council for Urological Interests, 668 F.3d at 708, and Baxter Healthcare Corp. v. Weeks, 643 F. Supp. 2d 111, 115-16 (D.D.C. 2009).

Returning from the realm of abstraction, the Court turns to various ways in which Empire Health alleges that judicial review will actually or practically be lost in this case: (1) various claims will be unchallengeable following the remand, (2) no post-remand PRRB appeal will be allowed, and (3) its claims to statutory interest will be snuffed out.

### 1. Preclusion of Certain Claims

Empire Health devotes its greatest attention to the first argument – namely, that following the remand order, certain claims will no longer be appealable to the Board (or beyond), and thus judicial review should be available now. See Opp. at 9-21; see also Mathews v. Eldridge, 424 U.S. 319, 332 n.11 (1976) (outlining "core principle that statutorily created finality requirements

should, if possible, be construed so as not to cause crucial collateral claims to be lost and potentially irreparable injuries to be suffered"). This contention may seem, at first blush, implausible; in federal-court litigation, a remand typically does not somehow eliminate subsequent appeals. Understanding Plaintiffs' argument thus requires some regulatory excavation.

As background, the Secretary generally differentiates between appeals from an <u>initial</u> NPR and appeals from a <u>revised</u> NPR that results from a special procedure known as a "reopening." A reopening may occur at some point after an initial NPR is calculated by the fiscal intermediary. That is, the intermediary's reimbursement determination "may be reopened, with respect to specific findings on matters at issue in a determination or decision," 42 C.F.R. § 405.1885(a)(1), and the intermediary may then reconsider certain specific issues. <u>See HCA Health Servs. of Okla., Inc. v. Shalala</u>, 27 F.3d 614, 620 (D.C. Cir. 1994). Where a provider might, during an initial appeal, challenge the NPR's "total program reimbursement" and all issues therein, 42 U.S.C. § 1395oo(a)(1)(A)(i), "post-reopening appeals" are "limited to the specific issues decided on reopening." <u>HCA Health</u>, 27 F.3d at 620; <u>see</u> 42 C.F.R. § 405.1889(a) (providing "revision must be considered a separate and distinct determination or decision" that can be appealed). These appeals of revised NPRs are thus "issue-specific," a limitation designed to "'forestall repetitive or belated litigation of stale eligibility claims.'" <u>HCA Health</u>, 27 F.3d at 620-21 (quoting <u>Califano v. Sanders</u>, 430 U.S. 99, 108 (1977)); <u>accord</u> <u>St. Mary of Nazareth Hosp. Ctr. v. Schweiker</u>, 741 F.2d 1447, 1449 (D.C. Cir. 1984). "[A]s a result," Empire Health contends, administrative or judicial "appeals [following] a reopening decision do not extend beyond the revisions themselves," and other claims would be lost. <u>HCA Health</u>, 27 F.3d at 619.

Plaintiffs allege a reopening has taken place here. They argue that even if <u>some</u> issues in their case were appropriately remanded via CMS Ruling 1498-R, <u>other</u> challenges were erroneously also set back to the intermediary. <u>See</u> Nov. 4, 2015, Letter to PRRB (insisting Medicare-SSI-fraction issue "WAS NOT our only claim – nor was it our primary claim"). Because during a reopening those other issues would not be reconsidered by the intermediary, Empire Health contends that it would lose its PRRB appeal rights on those issues. <u>See</u> <u>HCA Health</u>, 27 F.3d at 619.

The fundamental difficulty with such a position is that the remand here is not a reopening at all. A comparison of relevant regulations makes this clear. On one hand, a rule provides that a fiscal intermediary's decision "must be reopened and revised" if it is "inconsistent with [an] applicable . . . CMS ruling . . . <u>in effect</u>." 42 C.F.R. § 405.1885(c)(1)(i) (emphasis added) (laying out "[e]xamples" of proper reopenings). On the other hand, a neighboring rule offers that "[a] <u>change</u> of legal interpretation or policy by CMS in a . . . CMS ruling . . . , whether made in response to judicial precedent or otherwise, is <u>not</u> a basis for reopening." <u>Id.</u> § 405.1885(c)(2) (emphasis added) (providing "[p]rohibited reopenings"). CMS Ruling 1498-R, issued in response to <u>Baystate</u>, 587 F. Supp. 2d 37, easily falls into the latter category and is not implementing a law already in effect. It therefore is not – and, indeed, could not be – a reopening. To underscore this conclusion, the Ruling itself independently provides that it is "not an appropriate basis for the reopening of any final determination of . . . a fiscal intermediary." CMS Ruling 1498-R at *18 ("[A]ccordingly, it is hereby held that . . . the fiscal intermediaries . . . may not reopen any determination or decision with respect to any of the three DSH issues . . . .").

A reopening, furthermore, constitutes a full reconsideration of certain issues with the opportunity for "additional evidence or argument," resulting in "a complete explanation of the basis for any revision."  42 C.F.R. § 405.1887(b)-(c); see St. Mary of Nazareth, 741 F.2d at 1449 (describing how reopening may depend on new and material evidence); Athens Cmty., 686 F.2d at 994 (same). The Ruling's "remand," in contrast, reflects a purely technical procedure that asks intermediaries to "recalculat[e] the SSI fraction for each properly pending claim." CMS Ruling 1498-R at *14; see, e.g., Mission Hospice, LLC v. Sebelius, No. 10-0897, 2011 WL 3299090, at *3 (W.D. Okla. July 29, 2011) (considering "remand . . . to recalculate the claimed overpayment in accordance with its changed policy . . . reflected in . . . [CMS] Ruling No. 1355-R").

    After the intermediary's recalculation is complete, the case would likewise not be treated as if it had been reopened; no regulations or rules suggest that certain issues would be precluded from Plaintiffs' post-remand appeal.  The PRRB Rules provide that issues would instead be preserved:

> If an issue(s)/case was remanded pursuant to a CMS ruling (e.g., CMS Ruling 1498-R), the Provider must address whether the CMS ruling permits reinstatement of such issue(s)/case.  If the Board reinstates an issue(s) or case, the Provider will have the same rights (no greater and no less) that it had in its initial appeal.

PRRB Rule 46.1 (July 1, 2015), https://www.cms.gov/Regulations-and-Guidance/Review-Boards/PRRBReview/Downloads/PRRBRULES_07_01_2015.pdf.   Following along with this Rule, CMS Ruling 1498-R would permit reinstating the original PRRB reimbursement appeal, as it provides that "[t]he revised NPR will be subject to administrative and judicial review." CMS Ruling 1498-R at *14.  Then, in those post-remand appeals, Empire Health would have the "same rights (no greater and no less)" as to the issues that it had raised in its prior appeal. See

PPRB Rule 46.1 (emphasis added).  From these rules it appears that Empire Health's concern that certain issues would be lost in the remand shuffle is unconvincing.

### 2. *Preclusion of Administrative Appeals*

Plaintiffs next point out that even if <u>issues</u> would not be lost in a post-remand appeal, their entire <u>appeal right</u> might be in jeopardy.  <u>See</u> Opp. at 19-21.  Picking up where the last section left off, the same PRRB Rule indeed provides that Plaintiffs would have post-remand appeal rights only "[i]f the Board reinstates an issue(s) or case."  PRRB Rule 46.1 (emphasis added).  Both sides agree that this "if" signals that reinstatement of any appeal would be "discretionary with the Board."  Opp. at 19; Reply at 9 (agreeing appeal is in Board's "discretion").

The question, then, is whether subjecting post-remand appeal rights to Board discretion is the same as placing a "practical roadblock" in front of administrative and judicial review such that the <u>Michigan Academy</u> exception would be triggered.  <u>See</u> Am. Chiropractic, 431 F.3d at 816.  To begin, the Court notes that if the PRRB <u>does</u> reinstate an appeal, the review process would proceed as normal, all the way to federal court.  <u>See</u> PRRB Rule 46.1 (providing "same rights" as initial appeal).  The nature of any perceived roadblock thus depends on what happens if the PRRB <u>denies</u> reinstatement of an appeal – that is, if it refuses to grant a post-remand appeal.

The Secretary presupposes the answer is easy: Empire Health could simply file a civil action in federal court to challenge an appeal-reinstatement denial and present its claims then.  <u>See</u> Opp. at 9-10; <u>see also</u> Jordan Hosp., 571 F. Supp. 2d at 117 (explaining that at conclusion of administrative proceedings, hospital may "obtain judicial review from a federal court" and "raise all claims of errors").  The case law, however, is not definitive as to whether such a civil action

would even be possible.   Although at least one circuit-court and one district-court decision have assumed that such denials were reviewable under an arbitrary-and-capricious standard, see Kaiser Found. Hosps. v. Sebelius, 649 F.3d 1153, 1159-61 (9th Cir. 2011); Novacare, Inc. v. Thompson, 357 F. Supp. 2d 268, 272-73 (D.D.C. 2005), two other district courts have passed over this same question.   See Kidney Ctr. of Hollywood v. Shalala, 63 F. Supp. 2d 51, 54 (D.D.C. 1999) (dismissing on other grounds a case where government argued that "decisions to deny reinstatement of the appeals[] are not subject to review"); Livingston v. Sullivan, No. 89-2281, 1991 WL 126007, at *2 (D.D.C. June 28, 1991) (dismissing case and denial-of-reinstatement argument because plaintiff died); cf. Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453 (1999) (holding that refusal to reopen is not appealable).

If, as Plaintiffs contend, filing a civil action following a Board denial of an appeal-reinstatement request is barred, then they might indeed have an argument that the Michigan Academy exception would spring into action to prevent that possibility by allowing immediate review of the remand order.   Empire Health's opening premise, however, does not obtain. Whether a civil action can be brought depends on whether such denials are "agency action . . . committed to agency discretion by law."   Inova Alexandria Hosp. v. Shalala, 244 F.3d 342, 346 (4th Cir. 2001) (quoting 5 U.S.C. § 701(a)(2)); see Opp. at 20.   Judicial review is foreclosed in those instances where the statute, relevant regulations, and formal or informal policy statements are "drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."   Heckler v. Chaney, 470 U.S. 821, 830 (1985); see Steenholdt v. FAA, 314 F.3d 633, 638 (D.C. Cir. 2003).   In other words, only if denying post-remand appeals falls within the PRRB's unfettered discretion would judicial review of an appeal-reinstatement denial be precluded.

A Fourth Circuit decision on such denials guides this Court's analysis.  In <u>Inova</u>
<u>Alexandria Hospital</u>, that Circuit considered a situation where the PRRB denied a request for
reinstatement by citing an agency rule that if the provider missed certain deadlines to file the
request, "the Board <u>may</u> dismiss the appeal."  244 F.3d at 347 (emphasis added).  <u>Inova</u>
<u>Alexandria Hospital</u> explained that, although the word "may" was unadorned, courts could
consider the rule's context along with the "general goal" being pursued.  <u>Id.</u> at 348 (quoting
<u>Robbins v. Reagan</u>, 780 F.2d 37, 45 (D.C. Cir. 1985)).  That Circuit then held that, because the
rule's gestalt was to ensure fair yet efficient docket management, the word "may" implied an
excusable-neglect standard.  <u>See id.</u> at 347-48 ("These interests are served by a provider appeals
process that is fair and evenhanded.").  <u>Inova Alexandria Hospital</u>, therefore, provides both an
approach and a prime example of how, even when discretion is facially broad, judicially
manageable standards may be gleaned.

PRRB Rule 46.1 is similarly clear that it does not grant absolute agency discretion to
deny appeals.  First, by prohibiting reinstatement "if the Provider was at fault," the Rule presents
this option as an equitable decision dependent on the hospital's good-faith adherence to
procedural rules.  Next, by requiring that "the Provider must address whether the CMS ruling
permits reinstatement," the Rule strongly suggests that any reinstatement decision would be
guided, in part, by the dictates of the applicable CMS Ruling.  <u>See</u> CMS Ruling 1498-R at *14
(permitting that "revised NPR will be subject to administrative and judicial review").  Finally, by
preserving for the provider "the same rights (no greater and no less) that it had in its initial
appeal," the Rule evinces a desire to ensure that providers do not lose appeal rights
unnecessarily.  Of course, absent full briefing, the Court is uncertain if these are the <u>only</u> factors

and is even less certain as to how the PRRB would exercise its discretion in Empire Health's particular case.  But these guidelines are, for now, enough.

If the Board were to deny a request to allow a post-remand appeal, that denial would be reviewable in federal court under an arbitrary-and-capricious standard, guided (at minimum) by principles of equity, CMS Ruling 1498-R's guidelines, and a presumption that appeal rights should be preserved.  See, e.g., Kaiser Found., 649 F.3d at 1159-61; Novacare, 357 F. Supp. 2d at 272-73.  In that action, Plaintiffs would be able to bring all claims that the PRRB refused to reinstate or consider.  See Ill. Council, 529 U.S. at 23 (holding district courts have "adequate authority to resolve any statutory or constitutional contention that the agency does not, or cannot, decide"); see also Dist. Hosp. Partners, L.P. v. Sebelius, 794 F. Supp. 2d 162, 169 (D.D.C. 2011) (reiterating that all claims may be brought "[s]o long as the plaintiff can channel the 'action' through the agency").  Because judicial review of all issues is ultimately available even if Empire Health is denied post-remand appeal, the usual finality rules continue to bar this action.

### 3. *Preclusion of Statutory Interest*

Following this Court's previous discussions, Empire Health's next backdoor to judicial review appears to be quickly closing.  Plaintiffs explain that they are entitled to statutory interest in any successful civil action, see 42 U.S.C. § 1395oo(f)(2), which begins to accrue 180 days following the fiscal intermediary's determination of the provider's "total program reimbursement."  Id. § 1395oo(a)(1)(A)(i), (a)(3).  For them, this determination refers only to the initial NPR, and thus the statutory-interest provisions "are not applicable when the appeal is based strictly upon the Secretary's reopening regulations."  Opp. at 23.  Hence, as Plaintiffs allege, in a later appeal on a revised NPR, a statutory-interest claim would be foreclosed.

This refrain may sound familiar.  This Court has already decided that the remand is <u>not</u> a reopening, <u>see</u> *supra* Section III.B.1, and articulated how Empire Health would go about requesting reinstatement of its <u>initial</u> appeal of its NPR.  <u>See</u> *supra* Section III.B.2.  If the PRRB denies reinstatement, Plaintiffs could bring their statutory-interest claim, as with all their claims, in any subsequent civil action.  Alternatively, if the PRRB reinstates, Empire Health "will have the same rights (no greater and no less) that it had in its initial appeal" – including, presumably, its statutory-interest rights.  <u>See</u> PRRB Rule 46.1.

It is also significant that Defendant has conceded that the statutory-interest claim would still be available after reinstatement and in future civil actions.  <u>See</u> Reply at 13 ("If Plaintiffs receive a final agency decision, <u>and</u> opt to seek judicial review of that decision, <u>and</u> if their challenge succeeds, then the statutory interest provision will apply in accordance with the statute's own terms at that time.").  Given that "potential entitlement to [statutory interest] should not, in the circumstances of this case, be impeded or complicated by remanding in advance of a substantive determination," Empire Health loses no rights to judicial review if the Court permits the remand to go through.  <u>Mission Hospice</u>, 2011 WL 3299090, at *3 (where Secretary conceded in face of similar attorney-fees argument).  Plaintiffs' third and final attempt to avail themselves of the <u>Michigan Academy</u> exception thus falls flat.

C. *Leedom* Jurisdiction

Last, Empire Health's Complaint raises the possibility of jurisdiction pursuant to <u>Leedom v. Kyne</u>, 358 U.S. 184 (1958).  <u>See</u> SAC, ¶ 4; Opp. at 30-34.  First off, the independent role of <u>Leedom</u> jurisdiction is unclear when the more specific <u>Michigan Academy</u> exception grants a judicial-review outlet in Medicare cases.  <u>See</u> <u>Amgen, Inc. v. Smith</u>, 357 F.3d 103, 111 (D.C. Cir. 2004) (articulating that <u>Michigan Academy</u> was "particularly strong" in <u>Leedom</u> circumstances);

Dart v. United States, 848 F.2d 217, 223 (D.C. Cir. 1988) (describing that Leedom's principles were "reaffirmed" in Michigan Academy).

In any event, Leedom jurisdiction is "extremely narrow in scope." Nat'l Air Traffic Controllers Ass'n AFL-CIO v. Fed. Serv. Impasses Panel, 437 F.3d 1256, 1263 (D.C. Cir. 2006). "[I]n order to justify the exercise of Leedom jurisdiction, a plaintiff must show, first, that the agency has acted 'in excess of its delegated powers and contrary to a specific prohibition' which 'is clear and mandatory,' and, second, that barring review by the district court 'would wholly deprive [the party] of a meaningful and adequate means of vindicating its statutory rights.'" Id. (quoting Leedom, 358 U.S. at 188; Bd. of Governors v. MCorp Fin., Inc., 502 U.S. 32, 43 (1991)). In light of the requirement that Plaintiffs must face a situation where they would wholly lose their statutory rights, the Leedom-jurisdiction argument suffers the same fate as Plaintiffs' myriad other jurisdictional ones. The fact remains that if Empire Health continues with the remand and pursues further administrative-review processes, it will be able to seek judicial review of all issues in due course. See Jordan Hosp., 571 F. Supp. 2d at 117 ("Once a final decision had been reached at the conclusion of that process, [the] Hospital may then obtain judicial review from a federal court. At that time, [the] Hospital will be able to raise all claims of error related to the administrative proceedings.").

## IV.    Conclusion

For these reasons, the Court will grant Defendant's Motion to Dismiss. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: September 19, 2016